# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs January 5, 2011

## STATE OF TENNESSEE v. DARREL WATSON

**Direct Appeal from the Criminal Court for Shelby County**
**No. 05-00925      Joseph Dailey, Judge**

**No. W2010-00166-CCA-MR3-CD  - Filed August 17, 2011**

Defendant-Appellant, Darrel Watson, was convicted by a Shelby County jury of first degree premeditated murder and was subsequently sentenced to life imprisonment.  The sole issue presented for our review is whether the evidence was sufficient to support his conviction. Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which ALAN E. GLENN and J. C. MCLIN, JJ., joined.

Samuel L. Perkins, and David J. Kreher (at trial), Memphis, Tennessee; Robert W. Jones, District Public Defender, and Tony N. Brayton (on appeal), Assistant Public Defender, Memphis, Tennessee, for the Defendant-Appellant, Darrel Watson.

Robert E. Cooper, Jr., Attorney General and Reporter; J. Ross Dyer, Assistant Attorney General; William L. Gibbons, District Attorney General; and Glen C. Baity and Rachel Newton, Assistant District Attorneys General, for the Appellee, State of Tennessee.

## OPINION

On September 29, 2006, a Shelby County jury convicted the Defendant-Appellant of first degree premeditated murder, and he was sentenced to life imprisonment.  The Defendant-Appellant timely filed a motion for new trial, which the trial court denied. Following the appointment of a public defender, the Defendant-Appellant filed a notice of appeal.[1]

---

[1]Although the notice of appeal was untimely, this court waived timely filing of the notice of appeal

(continued...)

**Facts.** On April 19, 2004, the victim, Sheronda Watson, called her close friend, Tiffany Morton, to see if Morton would pick her up after work. The victim told Morton that she and her husband, the Defendant-Appellant, were having marital problems and that she was ready to leave the marriage. When Morton arrived, she noticed that the victim had a "gash above her eye." The victim then told Morton that she was afraid that the Defendant-Appellant was going to kill her because he had been abusive to her and had told her that he could not contemplate her living after he was dead. The Defendant-Appellant had informed the victim that he had stomach cancer, although the victim did not believe this diagnosis. Morton was aware that the Defendant-Appellant had been physically abusive to the victim on prior occasions, and this abuse included him cutting her wrist, pulling her hair, and locking her in the marital home and torturing her.

Morton took the victim to her apartment because the victim was afraid to go home. Shortly thereafter, the victim spoke to the Defendant-Appellant on the telephone. Morton then tried to get the victim to leave with her to get some dinner, but the victim chose to stay at Morton's apartment. When Morton returned a short time later with dinner, the victim seemed to have changed her mind about leaving the Defendant-Appellant and wanted Morton to drive her home. Morton said she took the victim home that night, and she never saw the victim again. The following day, Morton received a phone call from the Defendant-Appellant asking if the victim was planning on leaving him.

On April 28, 2004, the victim talked with her work supervisor, Terry Moss, about the state of her marriage. The victim told Moss that she was trying to decide if she was going to stay in her marriage. Because the victim and Moss were friends, the victim had often told Moss about the abuse she suffered at the hands of the Defendant-Appellant. On April 29, 2004, the victim did not appear at work, and Moss was about to send someone over to the victim's home to check on her safety when he saw an alert on his computer that a domestic violence incident had occurred at the victim's home.

At approximately 1:30 p.m. on April 29, 2004, Jerry Starks, the victim's uncle, received a telephone call from the victim. Starks could tell from the conversation with the victim that she was in danger and needed help. Starks called the victim's mother, Angela Barron, and Barron drove to the victim's home.

---

[1](...continued)
document in the interest of justice because the public defender's office was not immediately informed of the appointment and the Defendant-Appellant was not responsible for the delay.

When Barron arrived at the victim's home at approximately 2:00 p.m., she knocked on the door and heard her daughter screaming. She then heard someone being thrown into a window. Because the doors to the house were locked, Barron attempted to look in the window where she had heard the sound to see what was happening, but the blinds were down. The glass in the window had already started to break, and Barron kicked in the bottom part of the window and climbed inside the house into the kitchen. As she crawled inside the home, she heard the victim say, "He's stabbing me." She then observed the Defendant-Appellant holding a large butcher knife over the victim on the floor. Barron tried to pry the knife away from the Defendant-Appellant, but he pushed her away and stabbed the victim. Barron then tried to pull the Defendant-Appellant away from the victim, but he was able to stab the victim on her left side. She again tried to get the knife, but the Defendant-Appellant stabbed the victim in the chest. Barron heard the victim say, "Mama, I'm gone[,]" before she saw the victim's eyes darken and roll back into her head. Barron then ran outside and yelled for someone to call 911.

Barron stated that the victim and the Defendant-Appellant had become very depressed after their foster children, whom they were going to adopt, were taken away by the State. She acknowledged that the relationship between the victim and the Defendant-Appellant deteriorated after the loss of the children. Barron also recalled telling the police that she thought the Defendant-Appellant said that the victim had cheated on him during Barron's struggle with him over the knife.

When the police entered the home, they found the Defendant-Appellant standing near the kitchen covered in blood. The police told the Defendant-Appellant to get on the ground, and when he just looked at them, the police sprayed him with a chemical agent. The police then put the Defendant-Appellant in handcuffs without incident. As they were handcuffing the Defendant-Appellant, the police noticed the victim in the kitchen and checked to see if she was still alive. When one of the officers asked the Defendant-Appellant for his name, he did not answer but asked the officer for his name. Another officer heard the Defendant-Appellant state, "I saw Zulu." At the time the Defendant-Appellant was placed in the patrol car, two officers described his demeanor as extremely "calm[,]" although he did not have much to say to the officers. The police observed the victim lying on the floor with a butcher knife still in her chest. One of the officers stated that the knife had gone through the victim's body and had pierced the rug that was underneath her. The officers also observed bloody footprints and clothing in the laundry room as well as bloody footprints and water in the sink in the bathroom. The medical examiner determined that the victim died as a result of multiple stab wounds. The autopsy records established that the victim had been stabbed more than twenty times.

## ANALYSIS

**I. Sufficiency of the Evidence.** The Defendant-Appellant contends that the evidence is insufficient to support his conviction for first degree premeditated murder. Specifically, he argues that he was incapable of forming the requisite intent to support a finding of premeditation. In response, the State argues that a rational jury could have determined that the Defendant-Appellant killed the victim intentionally and with premeditation based on the evidence presented at trial. We agree with the State.

The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support a finding by the trier of fact of guilt beyond a reasonable doubt." Guilt may be found beyond a reasonable doubt in a case where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)). The trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and must reconcile all conflicts in the evidence. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). When reviewing issues regarding the sufficiency of the evidence, this court shall not "reweigh or reevaluate the evidence." Matthews, 805 S.W.2d at 779 (citation omitted). This court has often stated that "[a] guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." Bland, 958 S.W.2d at 659 (citation omitted). A guilty verdict also "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id. (citing State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982)).

First degree murder is the premeditated and intentional killing of another person. T.C.A. § 39-13-202(a)(1) (2003). Premeditation is defined as "an act done after the exercise of reflection and judgment." Id. § 39-13-202(d). This section further defines premeditation:

> Premeditation means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order

> to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. "'Premeditation is the process of thinking about a proposed killing before engaging in the homicidal conduct[.]'" State v. Brown, 836 S.W.2d 530, 540-41 (Tenn. 1992) (quoting C. Torcia, Wharton's Criminal Law § 140 (14th ed. 1979) (internal quotation marks omitted)).

The Defendant-Appellant argues that he did not act with premeditation since "the circumstances of the homicide show that [his] actions were the result of a sudden psychotic outburst and not actions taken after the exercise or reflection and judgment." He also claims that the medical proof at trial regarding his long-standing history of mental problems, his diagnosis of schizo-affective disorder, and Dr. Ciocca's and Dr. Johnson's conclusions regarding his diminished capacity to form premeditation, were so substantial that no rational jury could have determined that he acted with premeditation during this offense.

We acknowledge that "[a] defendant may not be convicted of first degree premeditated murder if, as the result of a mental disease or defect, he or she lacked the capacity to form premeditation." State v. Holder, 15 S.W.3d 905, 913 (Tenn. Crim. App. 1999) (citing State v. Hall, 958 S.W.2d 679, 690 (Tenn. 1997)). In addition, the rule of diminished capacity acknowledges that a defendant may present "expert, psychiatric evidence aimed at negating the requisite culpable mental state." Hall, 958 S.W.2d at 688; see also State v. Perry, 13 S.W.3d 724, 734 (Tenn. Crim. App. 1999). As applied today, "diminished capacity is not considered a justification or excuse for a crime, but rather an attempt to prove that the defendant, incapable of the requisite intent of the crime charged, is innocent of that crime but most likely guilty of a lesser included offense." Hall, 958 S.W.2d at 688 (citing United States v. Cameron, 907 F.2d 1051, 1067 (11th Cir. 1990)).

At trial, the defense presented the expert testimony of Dr. John Ciocca, a clinical psychologist. Dr. Ciocca testified that the defense asked him to conduct a full evaluation of the Defendant-Appellant's mental state, including making a determination about whether he suffered from a mental illness, disease, or defect at the time of the offense in this case. Dr. Ciocca stated that he and Dr. Tucker Johnson, another clinical psychologist, interviewed the Defendant-Appellant, reviewed his medical records, including records from Middle Tennessee State Hospital, and conducted psychological testing. Dr. Ciocca and Dr. Johnson ultimately concluded that the Defendant-Appellant suffered from depression as well as a serious mental disorder known as schizo-affective disorder, which is a combined disorder of schizophrenia and major depression. Dr. Ciocca explained why he believed that the Defendant-Appellant met the criteria for schizo-affective disorder, depressed type:

We believe that he meets the criteria because he has suffered from depression for a very long time going back to his . . . early adolescence when he attempted to commit suicide and was hospitalized, through his early adulthood when he was hospitalized for acute psychotic reaction where he lost contact with reality. And this happens. It's not always true that someone with schizophrenia or schizo-affective disorder is out of touch with reality. But sometimes their symptoms begin to accelerate[,] and they lose touch with reality. And when that happens with [the Defendant-Appellant], it's our opinion that the voices he describes hearing are very dangerous. They're dangerous to him because they tell him to kill himself, the voice. And the voices also suggest that he should kill others. He indicated to us during our evaluation that even in mid-adolescence when he was hospitalized for trying to kill himself that – there were two occasions where he tried to kill himself as an adolescent, that he was hearing voices.

Dr. Ciocca stated that the information regarding the Defendant-Appellant's medical history was corroborated by his mother and by other medical records regarding his treatment. Dr. Ciocca also volunteered that he and Dr. Johnson were the "first . . . mental health professionals to suggest that with this long course of depression, that's well documented, as well as the voices that he hears now, heard at the time of the offense, and heard back in 1994 that this would warrant a diagnosis of schizo-affective disorder, depressed type." When asked whether the Defendant-Appellant could have intentionally and with premeditation committed the act against the victim, Dr. Ciocca stated:

So at the time of the offense, it's my opinion that he was operating under the influence of his mental illness and . . . I don't believe that he could have formed intent. I don't believe he planned this. . . .

. . . .

So, . . . it's my opinion that this gentleman suffers from this mental illness, schizo-affective disorder which includes command hallucinations from this . . . entity called Zulu. And at the time of this offense, he was operating under the influence of those voices. . . . There [were] stressors going on at the time to justify this. To justify his regression, not the behavior itself. The loss of the [foster] twins. There were marital arguments. He was having more hallucinations, auditory and some visual. . . . [H]e regressed. . . . [W]hen a person becomes regressed in a psychotic and depressive state like this, to the point where they're psychotic in this illness, they become more impulsive, they're not have to use a great deal of rational thought. They're fending off

these command hallucinations or voices. And their ability to organize themselves and plan anything is very low. And so they become very reactive and impulsive.

Similarly, Dr. Johnson presented expert testimony that she did not believe the Defendant-Appellant acted with premeditation during the offense against the victim:

It's my professional belief that at the time of the alleged offense that the symptoms that [the Defendant-Appellant] was experiencing were of such a severe magnitude, his mental health symptoms were very prominent, they severely limited his ability to plan his actions. He was in a highly reactive state. He was very agitated. And his symptoms interfered with his ability to make rational decisions and to control his behavior. I don't think he had a lot of planning capacity. His symptoms magnified over time and his thoughts became very disorganized. So I don't think that at the time he . . . was able to rationally premeditate for any period of time his actions.

In rebuttal, the State presented the expert testimony of Dr. Samuel Craddock, a clinical psychologist at the Middle Tennessee Mental Health Institute. Dr. Craddock testified that he was asked by the State to determine whether the Defendant-Appellant had diminished capacity at the time of the offense in this case. Dr. Craddock diagnosed the Defendant-Appellant with moderate depression, borderline intellectual functioning, and moderate malingering. He explained that there were "about four different scales . . . suggesting that [the Defendant-Appellant was] embellishing his symptoms, exaggerating them, giving them more than what we suspect[ed][.]" He added, "He was presenting himself in a deceptive fashion during interviews and then during testing that was also indicative not of him trying to present himself [as] being mentally retarded, but [as] having a more severe illness or pathology than probably what actually exist[ed]." When asked whether the Defendant-Appellant's mental condition prevented him from acting with premeditation, Dr. Craddock replied:

I think he had the capacity to act with reflection and judgment. I don't know that he necessarily employed good judgment. I think he uses very poor judgment. But to the extent that it would remove his ability to act with premeditation, no, I don't see a mental condition that severe.

The Defendant-Appellant contends that his medical proof was so substantial that no rational jury could have found that he acted with premeditation during this offense. However, it is the jury's duty to determine the weight and value of expert testimony and to receive this evidence with caution. Edwards v. State, 540 S.W.2d 641, 647 (Tenn. 1976).

Accordingly, we will not "reweigh or reevaluate the evidence." Matthews, 805 S.W.2d at 779. Furthermore, we agree with the State that although the defense presented medical proof that the Defendant-Appellant's capacity to form premeditation was diminished at the time of the offense, the jury was under no obligation to accredit the defense's expert testimony over the State's expert testimony.

The Defendant-Appellant also argues that the State failed to prove that he acted intentionally and with premeditation during the offense. "A homicide, once proven, is presumed to be second degree murder, and the State has the burden of proving the elements of premeditation and deliberation to raise the offense to first degree murder." State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999) (citing State v. Nesbit, 978 S.W.2d 872, 898 (Tenn. 1998)). The existence of premeditation is a question of fact for the jury to determine and may be inferred from the circumstances surrounding the offense. State v. Rosa, 996 S.W.2d 833, 837 (Tenn. Crim. App. 1999) (citing Brown, 836 S.W.2d at 539). "[T]he use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime; and calmness immediately after the killing" may support the existence of premeditation. Bland, 958 S.W.2d at 660 (citing Brown, 836 S.W.2d at 541-42; State v. West, 844 S.W.2d 144, 148 (Tenn. 1992)). In addition, the "infliction of multiple wounds" and the "destruction or secretion of evidence of the murder" are also factors that support the elements of premeditation. State v. Nichols, 24 S.W.3d 297, 302 (Tenn. 2000) (citing Brown, 836 S.W.2d at 542). Finally, the jury may infer premeditation from the defendant's plans related to the murder that occur prior to the killing, from evidence regarding the defendant's motive, and from the nature of the killing. State v. Bordis, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995).

Viewing the evidence in the light most favorable to the State, we conclude that the evidence was sufficient to support a conviction for first degree premeditated murder. Aside from the medical proof, many factors indicative of premeditation were present in this case. The record is clear that the Defendant-Appellant used a deadly weapon, a butcher knife, to kill the victim, who was by all accounts unarmed. The fact that the victim was stabbed at least twenty times established that this killing was particularly cruel and that multiple wounds were inflicted. The Defendant-Appellant declared that he could not allow the victim to live after he was dead. Two different police officers at the scene stated that the Defendant-Appellant was extremely calm after the killing. Finally, two witnesses testified that they were aware that the victim and the Defendant-Appellant were having serious marital difficulties and had seen evidence of the physical abuse inflicted on the victim by the Defendant-Appellant.

Accordingly, we agree with the State that a rational jury could have found that the Defendant-Appellant killed the victim intentionally and with premeditation. Based on the verdict, the jury did not accept the Defendant-Appellant's claim of diminished capacity and accredited the State's witnesses over the defense's witnesses. Therefore, we conclude that the evidence is sufficient to support the Defendant-Appellant's conviction for first degree premeditated murder.

**CONCLUSION**

Upon review, we affirm the judgment of the trial court.


_____
CAMILLE R. McMULLEN, JUDGE